MIDWAY NATIONAL BANK & TRUST COMPANY,
Administrator of Estate of RALPH APPLEBY, v.
JAMES G. DAVIS, Director General of Railroads,
Appellant.

In Banc, July 8, 1921.

1. **PERSONAL INJURIES:** Railroad Under Federal Control: Compensation. Under the Federal Compensation Act of September 7, 1916 (Sec. 8932, U. S. St. 1916), and Section 10 of the Government Control Act of March 21, 1918 (U. S. Compiled Statutes, Sec. 3115¾j), and Order No. 50 of the Director General of Railroads, the measure of damages sustained by a switchman in the employ of a railroad on October 31, 1918, is governed by the laws in force prior to the time the Federal Government assumed control of railroads.

2. **PLEADING:** Interstate Commerce. Allegations that the defendant was the Director General of Railroads and as such was engaged in operating the properties of a named railroad in carrying on commerce by railroad among the states and so engaged in interstate commerce, and that a certain switchman, at the time of his injuries, was in the employ of defendant, engaged in the business of switching cars for defendant and engaged in the business of assisting defendant in carrying on said interstate commerce, sufficiently pleaded that said switchman was engaged in interstate commerce. The pleader is required to state the ultimate facts; it is neither necessary nor proper to plead the facts or circumstances by which the ultimate facts are to be proven.

3. ————: Knowledge of Defective Car. An allegation that defendant negligently furnished an engine that was defective and unsafe is equivalent to a statement that he knew, or by the use of ordinary care might have known, of the defective condition of the engine in time to have repaired it or to have procured another engine, and is sufficient after verdict.

4. **KNOWN DEFECT:** Continued Use: Time to Repair. If the defendant knows of the dangerous defect in a switch engine, which is liable to kill a switchman employed in the switching crew, and continues to use it, he cannot escape liability for injury to the switchman by a plea that he had not known of the defect long enough to repair it.

5. **INSTRUCTION**: Assumption of Undisputed Fact. An instruction which assumes that the engine which caused the switchman's injury was out of repair and that defendant knew or could have known of its defective condition is not erroneous, where no issue as to the truth of either fact is raised by the evidence.

6. **INTERSTATE COMMERCE**: Uncoupling Car in Switch Yard. A switchman engaged, at the time of his fatal injury, in taking from an interstate train a crippled car, destined for another state, was engaged in interstate commerce. In preparing a train for an interstate trip, the trainmen and the switch crew are to be considered as employed in interstate commerce, and if injured are entitled to the benefits of the Federal Employers' Liability Act.

7. **EXCESSIVE VERDICT**: $32,000: Passion and Prejudice: Remittitur: Penalty: In Excess of State Maximum. A widow sued for herself and her three minor children for damages resulting from the negligent killing of her husband, who was twenty-eight years of age, and whose life expectancy was 36.73 years and is the basis of calculation, since he was younger than the wife. His death occurred during the World War when wages were abnormally high, and the suit is brought under the Federal Employers' Liability Act. He was engaged as a switchman in a terminal yard, which is extremely hazardous work. *Held,* that it would be unfair to predicate the monetary value of his life either upon a continuation of the wages being earned at the time of his death or upon the normal expectancy of one of his age engaged in a non-hazardous employment, nor should the maximum penalty of ten thousand dollars allowed by our Damage Act (Sec. 4217, R. S. 1919), which is purely penal, and in no sense compensatory, be considered the measure of the damage; and there being no reason to conclude that the verdict of $32,000 was the result of passion or prejudice, the judgment is affirmed upon condition that plaintiff file a *remittitur* of $17,000.

　　*Held,* by WALKER, J., dissenting, that the judgment should not be affirmed upon condition that a *remittitur* of $17,000 be filed; for, (a) if the verdict is excessive to the point of shocking a sense of justice, it was the result of passion and prejudice and the cause should be remanded for a new trial, and (b) if the verdict was not the result of passion and prejudice, as the majority opinion finds, it is no part of the province of the Supreme Court to affirm on the condition of a *remittitur*, for that conclusion assumes that the appellate court is better qualified to determine the amount of the verdict than the jury:

　　*Held,* by GRAVES, J., dissenting, that (a) the Missouri Damage Act (Sec. 4217, R. S. 1919) is not purely penal, but the statute

declaring that the defendant "shall forfeit and pay as a penalty . . . the sum of two thousand dollars, and not exceeding ten thousand dollars, in the discretion of the jury," and there being no degrees of negligence and there being no room for compensation under the words of the statute denominating the amount to be recovered a "penalty," there is nothing upon which the jury can exercise a discretion; and (b) a sum in excess of ten thousand dollars under the Federal Act should not be allowed so long as the maximum amount recoverable under the State statute, for the identical negligence, is fixed at that amount.

Appeal from Jackson Circuit Court.—*Hon. Williard P. Hall,* Judge.

AFFIRMED (*on condition*).

*Edward J. White, Thos. Hackney* and *Leslie A. Welch* for appellant.

(1) The trial court erred in ruling that the Federal Compensation Act of September 7, 1916, did not apply and fix and govern the compensation payable by the Government to the widow and minor children of deceased. The Director General in operating the Missouri Pacific Railroad was not personally liable for damages for Appleby's death. He was a mere agent of the United States Government and the Government alone was obligated to make compensation therefor. Sec. 8932a, U. S. Comp. Stat. 1916; 39 Statutes at Large, 742. The tenth section of that act fixes the compensation where death ensues within six years from date of injury, at a monthly compensation equal to certain percentages of the deceased employee's monthly pay. Neither the Federal Control Act nor the orders of the Director General of Railroads altered, changed or increased the compensation to be made by the Government for the death of its employee, nor did the Federal Control Act, nor the orders of the Director General, nor both of them, have the effect of repealing these provisions of the Compensation Act. (2) Plaintiff's pe-

tition was fatally defective. (a) It is not alleged that the deceased at the time of his fatal injury was engaged in interstate commerce. (b) While it is alleged as a ground of negligence that the defendant had allowed the switch engine to become out of repair, yet it is not averred that the defendant knew its condition or by the exercise of ordinary care might have known it. Current v. Railroad, 86 Mo. 62, 66; Mueller v. Shoe Co., 109 Mo. App. 517. (3) The court erred in giving instruction P-1 for the plaintiff. (a) By this instruction the court told the jury that the defendant was liable if the engine was out of repair and this condition of the engine was known to the defendant, or through the exercise of ordinary care could have been known to him prior to the accident. This instruction wholly eliminated the important qualification that the master must have known of the defect or danger in time to have repaired it or to have procured another engine prior to the injury. Kelley v. Railroad, 105 Mo. App. 376; Pavey v. Railroad, 85 Mo. App. 222; Hurst v. Mining Co., 160 Mo. App. 58; Abbott v. Marion Mining Co., 112 Mo. App. 555; Schoppendorf v. Traffic Co., 141 N. Y. Supp. 486. (b) This instruction is erroneous for the further reason that it assumes that the evidence justified a finding that the engine "was out of repair so that and in such a way that the brakes on said engine could not be properly controlled." The evidence is insufficient to justify the submission of the case on this ground. Although the petition alleged both that the engine was out of repair and that the engineer negligently handled same, thus causing the jerks, the case was submitted solely on the ground of alleged defects. The fallacy of that theory is that there was no competent evidence that the engine was out of repair so that the brakes could not be properly handled. (c) This instruction also assumes that the condition of the engine "caused the car on which said Ralph Appleby was riding . . . to be jolted and jarred in a violent and unusual manner." The evi-

dence is insufficient to justify this conclusion. (d) This instruction was erroneous for the further reason that in the latter part it says: ''and if you further believe and find from the evidence that after defendant knew, or by the exercise of ordinary care could have known of said condition of said engine, if any, he negligently continued to use the same,'' etc. By this paragraph the court assumes as a fact that defendant did know, or could have known of the condition of the engine, and the language was well calculated to impress the jury with the belief that the court had decided this important issue in favor of the plaintiff. (4) The court erred in giving plaintiff's instruction P-5 defining what acts of the deceased would constitute interstate commerce. The mere fact that a number of cars had been assembled in the Missouri Pacific yards, some of which cars contained interstate freight, and the further fact that it became necessary to cut out the empty stock car not destined for a point out of the State, would not and did not make the movement of cutting out the stock car interstate commerce. (5) The switching of the empty stock car from track 9 to track 10 did not constitute interstate commerce. The empty stock car with broken coupler was not between any cars loaded with interstate freight. It was the 18th car in the drag and the 19th, 20th and 21st cars were empties not in interstate transportation. The mere fact that one or more interstate cars were coupled onto the stock car and as a mere matter of convenience were moved in switching the stock car onto track 10 did not make the movement interstate commerce. . The interstate cars could have been sent on to their destination without moving the empty stock car and the 19th, 20th and 21st cars, all of which could have been left standing on track 9, or these four cars could have been separately handled. The facts in this case are wholly unlike those in the Carr case, 238 U. S. 260. (6) The damages assessed by the jury are grossly excessive and the verdict shows that the

jury were controlled by passion, prejudice and sympathy, and wholly disregarded the evidence and instructions of the court, and the trial court erred in not sustaining defendant's motion for new trial and in not requiring plaintiff to remit the excessive damages. Assuming that the deceased would live the entire period accorded to persons of his age under the mortality tables; assuming that he would always be able to work, would lose no time on account of sickness or other disability; would always find constant employment at the high wages he was receiving at the time of his death; assuming also that his widow would live for the full period of his life expectancy under the mortality tables, and that the three children would each live the full period of their respective minorities, what then was the present value of the interest of the widow and children in his earnings which constituted their pecuniary loss recoverable by this action under the Federal Employers' Liability Act on account of his death? No fixed rule to determine this question has been laid down by the Federal Statute nor by the Federal Courts. Like many other questions arising in the administration of the Federal Employers' Liability Act, this question appears to have been left to be determined in a practical way by the law of the forum. C. & O. Ry. v. Kelly, 241 U. S. 491. In Missouri we have a statute (Secs. 8499, 8500 and 8501, R. S. 1909), lays down a rule for determination of similar questions and rights, and furnishes a reasonably fair guide for determining the amount of recovery in cases of this character.

*Brewster, Kelly, Brewster & Buchholz* and *Kimbrell & O'Donnell* for respondent.

(1)   The trial court did not err in ruling that the Federal Compensation Act of September 7, 1916, was not applicable to the case at bar. U. S. Compiled Statutes 1918, sec. 3115¾ J and sec. 10; U. S. Compiled Stat-

utes 1918, sec. 1974A; Dahn v. McAdoo, 256 Fed. 552.
(2)   Plaintiff's petition contained the necessary allega-
tions to bring the case under the Federal Employers'
Liability Act.   Thornton's Federal Employers' Liability
Act (3 Ed.), sec. 201; Roberts Federal Liability of Car-
riers, sec. 689; Grand Trunk Ry. Co. v. Lindsay, 233
U. S. 42; R. S. 1899, secs. 2082, 2119.  (a)   The petition
was sufficient as to the knowledge of the defendant of
a dangerous condition of its engine.   Fassbinder v. Mo.
Pac. Ry. Co., 126 Mo. App. 570; Johnson v. Ry., 96
Mo. 345; Kane v. Ry., 87 Mo. 588; Young v. Shickle
Iron Co., 103 Mo. 328; Zimmerman v. Pryor, 190 S.
W. 28.   (b)   Even if the petition was defective, the de-
fects are cured by the verdict and judgment.   Sexton
v. St. Ry. Co., 245 Mo. 263; Sawyer v. Wabash Ry. Co.,
156 Mo. 476; Machinery Co. v. Bottling Co., 273 Mo.
148; Sec. 1850, R. S. 1909.   (3)   The court did not err
in giving Instruction 1 in behalf of plaintiff.   Popejoy
v. Brick Co., 193 Mo. App. 616; Morgan v. Zinc Co.,
190 Mo. App. 26, 199 S. W. 592; Staggs v. Mining Co.,
199 S. W. 719; Green v. Ry. Co., 31 Minn. 248, 47 Am.
Rep. 787; Redmond v. Railroad, 225 Mo. 739; Shimmin
v. Mining Co., 187 S. W. 77; Oboron v. Nelson, 141 Mo.
App. 428.   Said instruction did not assume any con-
troverted facts.   The instruction as given was proper.
Sotebier v. Ry., 203 Mo. 702; Fullerton v. Fordyce, 121
Mo. 13; Dunavant v. Co., 188 Mo. App. 93; Davidson
v. Co., 211 Mo. 356.  (4)   This case came clearly under
the provisions of the Federal Employers' Liability Act.
New York Central Railroad Co. v. Carr, 238 U. S. 780;
Robert's Federal Liability of Carriers, sec. 500; Penn-
sylvania Co. v. Donat, 239 U. S. 50; Louisville & Nash-
ville Ry. Co. v. Parker, 242 U. S. 13.   (5)   The judg-
ment is not excessive.   Crecelius v. Chicago, Milwaukee
& St. Paul, 223 S. W. 413; Gulf Ry. Co. v. Carpenter,
201 S. W. 270; Peters v. Railway, 160 Cal. 48; Zucher
v. Whitridge, 143 App. Div. 191, 128 N. Y. Supp. 233;
Texas Ry. Co. v. Cunningham, 168 S. W. 428; Moore-

head v. Richmond Light Co., 111 App. Div. 35, 98 N. Y. Supp. 124; Houston Ry. Co. v. Davenport, 110 S. W. 150; Nearing v. Northern Pac. Ry., 110 Pac. 226; Steinfels v. Ry., 73 App. Div. 494, 174 N. Y. Supp. 512; Meng v. Bank, 169 App. Div. 27, 154 N. Y. S. 509; Kress & Co. v. Markline, 117 Miss. 37; Louisville & Northern Ry. Co. v. Holloway, 168 Kan. 262, 246 U. S. 525; Hines, Dir. Gen. v. Mills, 218 S. W. 777; Brickman v. Ry., 74 S. C. 306; Walker v. McNeil, 17 Wash. 582; Chesapeake & Ohio v. John, 155 Ky. 264; Bennett v. Ry., 98 S. C. 42, 233 U. S. 80; Lane v. Ry., 82 N. Y. Supp. 1057, 85 App. Div. 85; Near v. Ry., 41 Mont. 482.

HIGBEE, J.—This is an action brought under the Federal Employers' Liability Act, on account of the death of Ralph Appleby, a switchman. Suit was instituted by the widow, Beulah Appleby, as administratrix of the estate, for the benefit of herself and her three infant children, against William G. McAdoo, Director General of Railroads. On his resignation, Walker D. Hines, his successor in office, was substituted as defendant. After the appeal was taken in this cause, John Barton Payne, successor in office to Walker D. Hines, was substituted as defendant in his stead. Prior to the hearing, James C. Davis, his successor in office, was substituted as defendant in his stead.

At the time of his death, deceased was twenty-eight years of age. He was sober, industrious, and in good health. He was earning $150 per month and turned his checks over to his wife. He left as his surviving dependents his widow, twenty-four years old, and three children aged five, three and one and one-half years respectively.

The defendant's answer pleaded the Federal Compensation Act of September 7, 1916, as a bar to the action, denied all the allegations of the petition, and averred that the deceased came to his death by his own negligence. Since judgment was rendered in the circuit

court, Beulah Appleby has resigned as administratrix, and the Midwest National Bank & Trust Company has been duly appointed in her place and substituted as plaintiff in her stead.

The deceased met his death at about 3:05 o'clock on the morning of October 31, 1918. He was working as a switchman in the employ of the Director General in the yards of the Missouri Pacific Railway Company in Kansas City, Missouri. He had reported for duty at midnight, and so had been working about three hours at the time of his death. The crew had been performing various switching operations, in which the cars were "kicked" onto various tracks. They were making up a train to be delivered to the Kansas City Southern Railway, whose engine was to come over and get it. At about 1:30 a. m. the engine used by the switching crew began and continued to act very badly. Whenever the brakes were applied the engine would stop so suddenly and violently that it threw men out of bed in the cabooses that were being switched.

Mr. Dary, foreman of the switching crew, testified:

"Q. Just describe to this jury what happened—the action of the engine. A. Well, any time I would stop there would be a severe jerk, or the engine would jerk the cars so hard when we were moving that it would jerk the men out of bed in the cabooses. It jerked them out of bed and they complained.

"Q. Just tell the jury what was the difference between the ordinary jerk and the jerking on that night. A. Well, in stopping, when the engineer would apply the air it would give sudden jerks to the cars, and then it would slack them and then it would jerk them back again. It would cause damage to the cars. It pulled out a drawbar in stopping. We had on between twenty and thirty cars.

"Q. Where was the car on which Mr. Appleby was riding at the time you gave the stop or kick signal? A. Just opposite me.

"Q. When you gave the signal, you may say what, if anything, happened. A. When I gave the signal they just stopped right now. . . . I mean the whole drag stopped with a violent jerk and then lunged ahead again. . . . It stopped with an awful severe and sudden jerk. ·

"Q. What happened to Appleby? A. It jerked him underneath with his left leg across the rail, passing over him, right across his hip. . . : I never worked around an engine that stopped a drag as that did; as this engine had been jerking the cars around.

"Q. Did you ever see anything like this engine? A. No sir, I did not.

"Q. State whether in your opinion it would have been possible for a man to have stayed on the car jerked as this was jerked at this time. A. Well, he would have to have been expecting a jerk like that and would have had to be ready for it.

"Q. It was so violent and sudden? A. Yes sir.

"Q. In following the engine, what car would he ordinarily be riding? A. On the car he was cutting off.

"Q. When that car was cut off, if the engine made a sudden jerk would that car receive a sudden jerk? A. No sir.

"Q. He had been doing that all that evening before this drag, kicking it into track No. 10? A. Yes sir."

Mr. Boone, one of the crew, testified he heard Mr. Dary tell the engineer he was handling the engine "awfully rough." The engineer said he couldn't help it; the air was bad. They ordered another engine about an hour and a half before Appleby was killed. It would require about two hours to get steam up in the other engine and they continued to use the defective engine in the switching operations. It was necessary to get the car from which the drawbar had been pulled, out of the drag to make it ready for delivery to the Kansas City Southern Railway, and it was while this was being attempted that Appleby was killed. In this transfer there were several cars of merchandise billed to points in other states.

The car on which Appleby was riding at the time he met his death was a tank car of oil destined to Oil City, La. Deceased was doing his work in the usual and customary manner, and was in the act of pulling the lever to cut off the "bad order" car when he was thrown from the tank car and met his death.

Defendant stood on his demurrer to the plaintiff's evidence. The jury rendered a verdict for the plaintiff in the sum of $32,000, and judgment was entered accordingly, from which the defendant appealed.

I. Appellant contends that the Federal Compensation Act of September 7, 1916, governs the compensation payable by the Federal Government to the widow and children of the deceased employee. Section Compensation. 1 of the Act reads: "The United States will pay compensation as hereinafter specified for the disability or death of an employee resulting from a personal injury sustained while in the performance of his duty," etc. [Sec. 8932, U. S. St. 1916.]

Section 10 of the Government Control Act of March 21, 1918 (U. S. Compiled Statutes, sec. 3115¾j), provides: "Carriers, while under Federal control, shall be subject to all laws and liabilities as common carriers, whether arising under State or Federal laws or at common law, except in so far as may be inconsistent with the provisions of this act, or any other act applicable to such Federal control, or with the order of the President. Actions at law and suits in equity may be brought by and against such carriers, and judgments rendered as now provided by law; and in any such action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal Government."

From the foregoing act, as well as from Order No. 50 of the Director General, it is clear that actions of this character and the measure of damages is governed by the laws in force prior to the time the Federal Government assumed control of the railroads. The Supreme Court

of the United States has affirmed many judgments against the Director General of Railroads in actions of this character. This identical question was decided against appellant's contention in Dahn v. McAdoo, 256 Fed. 549. Syllabi 1 and 2 read:

"1. Under Act Aug. 29, 1916, authorizing President to take over transportation systems, President's proclamation of December 26, 1917, delegating control to Director General of Railroads, Federal Control Act, Sec. 10 (Comp. St. 1918, sec. 3115¾j), and General Order No. 50 of Director General, a personal injury action commenced subsequent to General Order No. 50 on a cause of action occurring during Federal operation may be maintained against Director General of Railroads.

"2. The Federal Employers' Compensation Act (Comp. St. sections 8932a-8932uu) does not provide an exclusive remedy, so as to preclude a railway mail clerk from maintaining a personal injury negligence action against the Director General of Railroads."

II. Appellant's second contention is that the petition does not allege that deceased was engaged in interstate commerce. We quote the pertinent averments:

Pleading: Interstate Commerce.

"The defendant, William G. McAdoo, Director General of Railroads, was as such, at all times herein mentioned, engaged in the business of operating the properties of the Missouri Pacific Railway, and said Director General was operating all of said properties in carrying on commerce by railroad between the State of Missouri and the various other states of the United States, and so was engaged in interstate commerce.

"Plaintiff further says that Ralph Appleby, at the time of his injuries, was in the employ of the defendant, and as such employee was engaged in the business of switching cars for the defendant and engaged in the business of assisting defendant in carrying on said interstate commerce."

As said in Thornton's Federal Employers' Liability Act (3 Ed.) sec. 201:

"To recover under the statute it must be shown by the pleading that the employee-plaintiff was at the time of his injury engaged in interstate commerce, and also that the defendant was a common carrier by railroad at the same time, in the transaction wherein the employee was injured, likewise engaged in interstate commerce. This may be done by direct averment, or by pleading of facts which show such is the fact."

In Grand Trunk Railway Company v. Lindsay, 233 U. S. 42, Mr. Justice WHITE said, at page 44:

"The right of the plaintiff, who is defendant in error here, to recover for an alleged personal injury, was stated in two counts. In both, the wrong was alleged to have been occasioned by the negligence of the railway company while it was engaged in carrying on interstate commerce and while the plaintiff was employed by it in such commerce."

The court held in that case that the allegation was sufficient.

The pleader is required to state the ultimate facts. It is not necessary, nor is it proper, to plead the facts or circumstances by which the ultimate facts are to be proven. [See v. Cox, 16 Mo. 166.] The evidence should not be pleaded. [Planet Property Co. v. Railway Co., 115 Mo. 613, l. c. 619.] We think the averments are sufficient and that it is not necessary to invoke the aid of Sections 1513 and 1550, par. 8, R. S. 1919, commonly called the Statute of Jeofails.

III. It is claimed that the petition is bad because it is not averred that the defendant knew or by the exercise of ordinary care might have known of the defective condition of the engine in time to have repaired it or to have procured another engine. The petition reads:

Pleading: Knowledge of Defective Appliance.

"Plaintiff further says that by reason of the carelessness and negligence of the defendant and his serv-

ants and agents, such switch engine had been allowed to become and be out of repair, and by reason of said engine being out of repair the brakes on said engine could not be controlled properly, and by reason thereof said engine would cause the cars which it was switching to be operated in a rough, negligent and dangerous manner. This plaintiff does not allege herein wherein said switch engine was out of repair for the reason that she is unable to do so and the facts lie more particularly within the knowledge of the defendant than within the knowledge of this plaintiff.

"Plaintiff further avers that by reason of said switch engine being so out of repair, said switch engine caused the car on which said Ralph Appleby was riding, engaged in his work as aforesaid, to be jolted, jarred and shot loose in a violent and unusual manner, and by reason thereof said Ralph Appleby was caused to be thrown from and off of said car and down under the wheels of said car, and the other cars which were being operated by defendant and the wheels of said cars passed over the body and limb of the said Ralph Appleby, whereby he was caused to suffer injuries from which he died almost instantly.

"Plaintiff further says that the servants and agents of the defendant who were in charge of the operation of the engine aforesaid carelessly and negligently handled said engine in a rough and unusual manner, whereby said engine caused said car on which said Ralph Appleby was riding as aforesaid to jolt and jar in a violent and unusual manner, whereby the said Ralph Appleby was caused to be thrown off of said car and under the wheels of said car and other cars and run over and injured and killed as aforesaid."

The averment is tantamount to an allegation that the defendant negligently furnished a defective engine, and is good after verdict.

In Johnson v. Railway Co., 96 Mo. 340, l. c. 345, NORTON, C. J., said: "The specific objection urged to

the above petition is, that it does not allege that defendant either knew, or might, by the exercise of ordinary care, have known that said hammer was not reasonably safe for the purposes for which it was to be used. In the case of Crane v. Railroad, 87 Mo. 588, it is held that in an action by a servant against his master for negligence in furnishing improper or unsafe appliances for the servant's use in his work, the petition must allege that the master either knew, or might, by the exercise of ordinary care, have known of the dangerous and defective construction of the appliance, or it must contain an equivalent averment, and that an allegation that the master negligently furnished an appliance which was defective and unsafe is an equivalent averment, and sufficient. Under this ruling, the objection to the sufficiency of the petition, based on the ground stated, is not well taken, as it is therein averred that the unsafe hammer was negligently furnished plaintiff by defendant.''

In Fassbinder v. Railway Co., 126 Mo. App. 563, l. c. 570, it was said: ''Further, it is contended that 'the petition is fatally defective in that it fails to charge that defendant knew or by the exercise of ordinary care might have known of the defective condition of the brake complained of.' The petition does not contain such specific allegation, but the facts pleaded bring the case within the rule followed in Tateman v. Railway, 96 Mo. App. 448, which is thus expressed in Young v. The Shickle, H. & H. Iron Co., 103 Mo. l. c. 328: 'An allegation that the defendant negligently furnished an appliance which was defective and unsafe was equivalent to a statement that the master knew, or might have known by the use of ordinary care, of the dangerous and defective character of the appliance.' ''

Under these rulings there is no substance in appellant's objection to the petition.

IV. Appellant complains of plaintiff's instruction numbered 1, in that ''the court told the jury that de-

fendant was liable if the engine was out of repair and this condition was known to the defendant, or through the exercise of ordinary care could have been known to him prior to the accident," and that it eliminates the qualification that the master should have known of the defect or danger in time to have repaired it or to have procured another engine prior to the injury.

Defective Engine: Continued Use: Time to Repair.

This instruction is very lengthy. Relative to the matter complained of, it told the jury that if they found that the dangerous condition of the engine was known to the defendant and he negligently continued to use the same, and Ralph Appleby, while engaged in assisting the defendant in interstate commerce as previously explained, was thrown from the car and killed, the verdict should be for the plaintiff.

The evidence of Mr. Dary, foreman of the switching crew and defendant's vice-principal, is that he complained to the engineer that he was handling them (the cars) "awfully rough," and that the engineer said that he could not help it, that the air was bad. Mr. Dary related to the jury that he ordered another engine and continued to use the defective one in the switching operations; that he was close to Applyby when he gave the signal to stop the engine and saw the deceased thrown under the wheels of the car.

The facts in this case differentiate it from the cases relied on by appellant. In Staggs v. Gotham Mining Co., 199 S. W. 717, l. c. 719, it was held that the fact that defendant was starting a new mill furnished no excuse for using a known defective engine to operate and make dangerous machinery about which innocent workmen were employed.

In another case it is said: "If a master knows or should know of dangerous defects in an instrumentality which he installs, he assumes liability for continuing its use, unless excused by such circumstances as show assumption of risk or contributory negligence. Such

cases cannot be likened to instances where public thoroughfares in municipalities are out of repair. The good of the public require their continued use, and, in ordinary circumstances, no liability attaches for repairs until a reasonable time for repair has elapsed since knowledge of the defect. There are, of course, many other instances. But this case is not in that class. If the proprietor of a passenger elevator in a public building knows of a dangerous defect in it, which is liable to kill or injure the unsuspecting operator or passengers, he cannot escape liability by the plea that he had not known it long enough to repair it." [Popejoy v. Hydraulic Press Brick Co., 193 Mo. App. 612, l. c. 616.]

In Green v. Ry. Co., 31 Minn. 248, 47 Am. Rep. 785, an engineer called the attention of the foreman of the roundhouse to certain defects in an engine and requested that it be repaired. The foreman told him he did not have time to repair it and had no other engine, and told him to go ahead and use it. The court said, at page 788: "There is nothing in the suggestion that defendant was not guilty of negligence, because of the fact that it did not have a reasonable time to repair this engine that day, and had no other engine in condition to send out. That was negligence in sending out an engine unfit for use, and it can hardly help defendant to plead that it did not have good engines enough to do the business of the road."

In Redmond v. Railroad, 225 Mo. 721, l. c. 739, VALLIANT, J., said: "The length of time the cars remained there did not render them more dangerous or more liable to produce this particular accident. The significance of the fact that a dangerous condition is suffered to remain a long time is that it indicates that the master had notice of it, but when there is no question about the master's knowledge the duration of the condition is immaterial."

In Morgan v. Zinc Co., 199 Mo. App. 26, 199 S. W. 590, l. c. 592, the court said: "The negligence consisted,

when he did know of it, in ordering the plaintiff to proceed with a negligently constructed appliance—the knowledge having been brought home to the foreman; and the right of the defendant to insist on a reasonable time within which to discover a defect and repair it cannot arise in a case wherein it is shown that the defect is known to the master before the order is given to use it in the known defective condition." See Shimmin v. Mining Co., 187 S. W. 76, 77: Oborn v. Nelson, 141 Mo. App. 428.

It was contrary to the Golden Rule, the rule of humanity, to continue to use an engine known to be defective and recklessly expose the deceased to deadly peril.

V. It is also said that plaintiff's instruction numbered 1 assumes that the evidence justified a finding that the engine "was out of repair so that and in such a way that the brakes on said engine could not be properly controlled."

*Assumption of Undisputed Fact.*

Mr. Dary, the foreman, testified that when the engineer would apply the air it would give sudden jerks to the cars, then it would slack them, and then it would jerk them back again. It would cause damage to the car. It pulled out a drawbar in stopping. Mr. McGuire, the engineer, testified that he laid the engine trouble to dirty triple valves, a mechanism used in the engine in connection with the air for the purpose of stopping the engine. When they are dirty they are too loggy to act, but when they do act, they act suddenly and make the brakes take hold quickly and stop the engine quick. Had trouble with the dirty triple valves ever since he went on the engine that night until Appleby was killed. On cross-examination, Mr. Hackney, counsel for appellant, asked the witness:

"Q. You used the engine with the dirty triple valves? A. Yes, sir.

"Q. About one-thirty you found it out for the first time? A. Yes, sir.

"Q. You say dirty triple valves was the report? A. Yes, sir." Here Mr. Hackney showed witness the report he had made of the engine to the mechanical department of the Missouri Pacific, which witness identified. Witness said he made the report under the rules of the road between one-thirty and two o'clock the morning of the accident. The complaint is without merit.

This instruction reads, in part: " . . . and if you further believe and find from the evidence that after defendant knew, or by the exercise of ordinary care could have known of said condition of said engine, if any, he negligently continued to use the same," etc. It is said that this assumes that the defendant knew or could have known of the condition of the engine and that this language was calculated to impress the jury what the court had decided this important issue in favor of the plaintiff.

It has been seen that there was, in fact, no issue raised on this proposition by the evidence. Appellant's counsel, in cross-examining the defendant's engineer, asked him: "You used the engine with the dirty triple valves? A. Yes, sir. Q. And you got another engine when? A. Four o'clock." Counsel also proved by the witness that he made a report before the accident of the dirty triple valves to the mechanical department. There was no dispute on this point.

"This court has many times held that the trial court may in its instructions to the jury assume the truth of a proposition which is established by the undisputed evidence in the case." [Sotebier v. Transit Co., 203 Mo. 702.]

"That the trial courts, under certain circumstances, may assume the existence of certain material facts, is well settled by a long line of decisions in this court. We have reached that stage under our system of jurisprudence, and it affords us pleasure to make note of this advanced step in the administration of the law in controversies in court, to apply to such litigated controversies practical and business rules." [Davidson v. Tran-

sit Co., 211 Mo. l. c. 356.]  See also Fullerton v. Fordyce, 121 Mo. l. c. 13, and Dunavent v. Co., 188 Mo. App. 93.
We find no error in the giving of this instruction.

VI.  Appellant contends that the court erred in giving plaintiff's instruction numbered 5, defining what acts constitute interstate commerce.  We quote the complaint:

*Interstate Commerce.*

"The mere fact that a number of cars had been assembled in the Missouri Pacific Yards, some of which cars contained interstate freight, and the further fact that it became necessary to cut out the empty stock car not destined for a point out of the State, would not and did not make the movement of cutting out the stock car interstate commerce."

Appellant also complains:

"(a)  The court erred in refusing defendant's instruction D-1 to the effect that the evidence was not sufficient to show that the deceased was engaged in interstate commerce at the time of his death.

"(b)  The court also erred in refusing defendant's instruction D-2, to the effect that if the jury found from the evidence that at the time of the fatal injury to Appleby he and the crew with which he was working were engaged in taking off of Track 9 and placing on Track 10 an empty stock car not being used in interstate commerce and not being moved in interstate commerce, the plaintiff could not recover.

"(c)  The court also erred in refusing defendant's instruction D-3, which told the jury that the switching of the empty stock car with broken or pulled-out coupler from Track 9 to Track 10 was not interstate commerce."

In 1 Roberts' Federal Liabilities of Carriers, sec. 500, the applicable rule is thus stated:

"The Federal act governs the liability of railroad companies to employees injured while 'breaking up' or 'making up' trains containing interstate traffic in railroad yards; for the transportation in interstate com-

merce includes switching movements as well as main line traffic. For example, a fireman on a switch engine at the time he was injured was engaged in shifting cars in a railroad yard. The cars which were attached to the engine at the moment of the accident were used solely in intrastate commerce, but the shifting and the movement of these cars were necessary for the purpose of making up a train to which cars were to be attached which came from points beyond the state and were destined to points in another state. The fireman's remedy was under the Federal act. A car inspector injured while coupling the air hose on a string of cars which were to become a part of a train then being made up in a yard, was employed in interstate commerce. An engineer engaged in switching cars from a train at a terminal point preparatory to placing the cars in the yard, was within the Federal act while so employed. A member of a switching crew engaged in switching cars between two points in the city of Indianapolis for the purpose of being made up into an interstate train was employed in interstate commerce. A switchman assisting in distributing cars from an interstate train and clearing the track for another interstate train has no remedy under a state law."

New York C. & H. River Ry. Co. v. Carr, 238 U. S. 260, is in point. The head note reads: "A brakeman on an intrastate car in a train consisting of both intrastate and interstate cars who is engaged in cutting out the intrastate car so that the train may proceed on its interstate business, is while so doing engaged and employed in interstate commerce and may maintain an action under the Employers' Liability Act."

We quote from the opinion by Justice LAMAR, l. c. 262:

"The railroad company insists that when the two cars were cut out of the train and backed into a siding, they lost their interstate character, so that Carr while working thereon was engaged in intrastate commerce

and not entitled to recover under the Federal Employers' Liability Act. The scope of that statute is so broad that it covers a vast field about which there can be no discussion. But owing to the fact that, during the same day, railroad employees often and rapidly pass from one class of employment to another, the courts are constantly called upon to decide those close questions where it is difficult to define the line which divides the state from the interstate business. The present case is an instance of that kind; and many arguments have been advanced by the railroad company to support its contention that, as these two cars had been cut out of the interstate rain and put on a siding, it could not be said that one working thereon was employed in interstate commerce. But the matter is not to be decided by considering the physical position of the employee at the moment of injury. If he is hurt in the course of his employment while going to a car to perform an interstate duty, or if he is injured while preparing an engine for an interstate trip, he is entitled to the benefits of the Federal Act, although the accident occurred prior to the actual coupling of the engine to the interstate cars. . . . The plaintiff was a brakeman on an interstate train. As such, it was part of his duty to assist in the switching, backing and uncoupling of the two cars so that they might be left on a siding in order that the interstate train might proceed on its journey. In performing this duty it was necessary to set the brake of the car still attached to the interstate engine, so that, when uncoupled, the latter might return to the interstate train and proceed with it, with Carr and the other interstate employees, on its interstate journey. . . . Under these principles the plaintiff is to be treated as having been employed in interstate commerce at the time of his injury, and the judgment in his favor must be affirmed.''

In L. & N. Ry. Co. v. Parker, 242 U. S. 13, l. c. 14, Justice HOLMES said: ''The business upon which the

deceased was engaged at the moment was transferring an empty car from one switch track to another. This car was not moving in interstate commerce and that fact was treated as conclusive by the Court of Appeals. In this the court was in error, for if, as there was strong evidence to show, and as the court seemed to assume, this movement was simply for the purpose of reaching and moving an interstate car, the purpose would control and the business would be interstate.''

It was necessary to set out the crippled car in order to make ready the train for delivery to the connecting carrier. The train included several cars loaded with interstate freight. The tank car upon which Appleby was riding was filled with oil destined for Oil City, La. It was while he was about to uncouple this car from the ''bad order'' car that he was thrown under the wheels of the train.

In Penn. Co. v. Donat, 239 U. S. 50, 36 Sup. Ct. Rep. 4, where a similar question was raised, the court said: ''The question presented on this writ of error is 'so frivolous as not to need further argument' and the motion to affirm the judgment below must be granted.'' The deceased was engaged in interstate commerce when he met his death.

VII.   The judgment for $32,000 is excessive, but there is no reason to conclude that it was the result of passion or prejudice. The deceased was 28 years of age at his death. His expectancy was 36.73 years. [R. S. 1879, sec. 5978.] The widow was younger than he, hence his expectancy and not hers is to be considered. His death occurred during the World War when wages were abnormally high. It must also be considered that the work of a switchman is extremely hazardous. It is unfair to predicate the monetary value of his life either upon a continuation of the wages earned by the deceased at the time of his death or upon the normal expectancy of one of his age in a non-hazardous employment. Nor should we adopt the maxi-

*Excessive Verdict.*

mum penalty of $10,000 allowed by the Damage Act, R. S. 1919, sec. 4217. That statute is purely penal and is in no sense or degree compensatory, as was held in Grier v. Ry. Co., 228 S. W. 454. If the plaintiff will, within ten days, enter a voluntary *remittitur* of $17,000, the judgment will be affirmed for $15,000 as of the date of its rendition; otherwise, it will be reserved and remanded.

All concur except *Graves* and *Walker, JJ.,* who dissent in separate opinions.

WALKER, J. (dissenting).—I concur in this opinion, except in the conclusion which directs a *remittitur* as a condition precedent to an affirmance of the judgment. If the verdict is excessive to the extent of shocking a sense of justice, the conclusion is authorized that it was the result of passion and prejudice and the judgment should be reversed and the cause remanded. If, however, as the opinion expressly holds, the finding was not the result of passion and prejudice, it is no part of the province of this court, despite rulings to the contrary, to affirm on the condition of a *rimettitur*. Such a conclusion assumes that the appellate court with nothing before it, except the cold record, is better qualified to determine the amount of the verdict than twelve men, sworn triers of the facts, who saw the witnesses and heard their testimony; and whose finding the trial judge refused to disturb.

GRAVES, J. (dissenting).—I. I do not concur in the holding that our statute, Section 4217, Revised Statutes 1919, is purely penal. I know that we have recently so ruled, which ruling, in my judgment, is without rhyme or reason. This statute in allowing a recovery, says that the defendant "shall forfeit and pay as a penalty . . . the sum of not less than two thousand dollars, and not exceeding ten thousand dollars, in *the. discretion of the jury.*" In law a penalty is a sum fixed for the doing of a wrongful act. In this instance the

wrongful act is negligence. In Missouri, we have consistently ruled that there are no degrees of negligence, and that we will not approve the doctrine of comparative negligence. If negligence is without degrees, as we have consistently ruled, then upon what is the jury to exercise its discretion, in fixing the penalty?

The jury can say that the negligence of defendant caused the death, but the penalty follows without considering the degree of the negligence. Without saying there are degrees of negligence recognized in this State (a question long since adversely ruled, and continuously ruled thereafter) there is absolutely nothing upon which the jury can exercise a discretion. In the matter of a penalty for the taking of life, the earning power, the age or expectancy of deceased, and all other things allowable as compensation are not to be considered. Penalty is one thing, and compensation is another. If the statute is purely penal, as my learned brother says, then the mere matter of death by negligent act is all there is properly before the jury. Compensatory matters have no place in the fixing of a penalty. Expectancy, earning power, and other things of like character have no place in the case. The time is near at hand when we will be forced to discover that our recent ruling upon this statute is without foundation. That time will come when we are called upon to pass upon the propriety of evidence in these cases as to earning capacity, expectancy, and other matters going to compensation solely.

II.   Another novel question is raised as to the limit of recovery in cases, under the Federal act, in this State. We have been allowing a recovery in death cases in excess of the Missouri statutory limit. The Federal act fixes no limit, but it provides for trials by State courts. If this had not been interstate work, the limit of recovery in Missouri would have been $10,000. Had the character of the work not been interstate, the negligence charged in this case could not have resulted in a verdict of more than $10,000. Our State courts are thus

placed in the position of saying to one class of our citizens, You can only recover $10,000, and to the other class (those working in interstate commerce), You can recover more than $10,000 for the identical negligence. I have long thought this wrong, and take this opportunity to so express myself. I therefore dissent to the idea of allowing a recovery in excess of $10,000, the amount fixed by the statute of the forum.