BEN M. PULLIAM v. WILLIAM W. WHEELOCK and WILLIAM G. BIERD, Receivers of CHICAGO & ALTON RAILROAD COMPANY, Appellants.— 3 S. W. (2d) 374.

Division One, March 3, 1928.

140

*Charles M. Miller* for appellants.

*J. V. Jones* and *Madden, Freeman & Madden* for respondent.

RAGLAND, J.—Plaintiff, while in the employ of the defendants as locomotive engineer, and while so engaged, suffered personal injuries through a head-on collision of two freight trains, caused by the mistake of one of defendants' telegraph operators in transcribing a train order. This action was brought under the Federal Employers' Liability Act to recover damages for the injuries sustained. That both the plaintiff and the defendants were at the time of the occurrence engaged in interstate commerce and that plaintiff's injuries, whatever they are, were caused by the defendants' negligence are tacitly conceded. The trial below spent itself on questions relating to the nature and extent of plaintiff's injuries; appellants' principal contention here is that the damages awarded plaintiff by the jury, $50,000 are grossly excessive.

The collision just referred to occurred in the early morning of October 19, 1922. The train of which plaintiff had charge as engineer was moving east at the rate of thirty-five miles an hour, and while so moving it collided with another freight train moving west at the rate of ten miles an hour. Just before the one crashed into the other plaintiff jumped from the cab of his engine. Shortly afterward he was found lying clear of the wreckage, not far from the track. He was quite helpless so far as locomotion was concerned, but appeared to be conscious and entirely rational. He was put on a cot and carried to the caboose of one of the trains; and then taken to Mexico, Missouri, twenty-five or thirty miles distant, where he was placed in a hospital. He remained there until October 25th; on that date he was removed to a hospital in Kansas City, and placed in charge of one of defendants' surgeons there. He was discharged from this latter hospital November 7th.

The plaintiff was forty-four years old and weighed something over 200 pounds. The visible injuries sustained by him were these: A cut over the left eye; a cut over the right eye and one across the right eye, injuring to some extent the eye ball; a cut across the nose; a cut and bruise on the back of the head; and a large bruise on the left side of the body just above the crest of the ilium, showing a discoloration as large as two hands or larger. The cuts across the forehead and nose soon healed, leaving nothing more than slight scars. There was a swelling of the tissues on the back of the head which

raised a knot about the size of a hen's egg. This enlargement remained for three or four weeks, and plaintiff still experienced a soreness in that region at the time of the trial, April, 1924. The injury to the tissues where the large discloration was did not readily yield to treatment. It was first thought to be a mere bruise, though a severe one. The first examination made, at the hospital in Mexico, disclosed that the muscles were hardened and rigid, the rigidity extending from the abdomen over the left side to the median line of the back. The tissues were infiltrated; the blood had soaked into them. On plaintiff's arrival at the hospital in Kansas City this injury was diagnosed as "a severe contusion of the muscles on the left side of the lower abdomen, a sprain of the sacroiliac joint, a contusion on the outside of the hip and lower down." The results of the contusions and "sprain," as they appeared to a physician who examined plaintiff about a month before the trial, were described by him as follows:

"I found that his gait was very unnatural and the position of his leg in trying to walk or stand was very unnatural; that it was not only an unnatural condition, but the position of the foot was everted, quite badly everted, and on attempting to move his leg inward to its normal position I found it gave considerable resistance, that is, that foot, or the toe on that side, would not move in as readily as his foot on the other side. On putting the patient on his back and letting that foot drop I found that it dropped outward much more easily than the one on the other side, the right foot. The position in which he stood was very, very awkward, simulating a badly crippled man. I examined the mechanism which controls the action of that foot, and that has to do with both the muscles of mechanical structure in the back and spine and those through the sacroiliac articulation that have the nerve supply for those parts. . . . I examined that articulation very carefully, and found that the left sacroiliac articulation had been very badly sprained and twisted and the tissues all thickened and very sensitive and a condition of limitation of motion due to this thickening of the tissues and fibers around that joint. That is particularly with reference to the *os innominatus* on that side. . . . The ligaments and soft parts binding those two bones together had evidently suffered a traumatic condition or traumatism. . . . Traumatism usually results in an infiltration of fibroid material. . . . That limits the motion of the joint and makes it very painful and it interferes with its functioning; the function of the joint is motion. . . . It also brings pressure on the sensory nerves; when we have an infiltration of fibroid material we always have an impingement of the sensory nerves. . . . They (the nerves) were not functioning properly, there was a lack of sensation in the foot, particularly the foot and leg on the left side. . . . There was an injury to the sensory parts and sensory nerves while the injury to

the motor nerves was plainly shown by the position in which the plaintiff stood. . . . The motor nerves carry the impulses out from the brain and spinal cord to the muscles, and are known as efferent or outcarrying nerves. If these efferent nerves are not working normally the movement of the parts will not be normal. In his left leg that certainly was the condition that I found. . . . The left leg is everted or turned outward and there is an inability on his part to carry it upward to a normal position; not only an inability on his part but when he lies in a passive condition there is a decided resistance to the movement of the physician trying to carry the part to the normal position; that is trying to carry the foot and leg into a normal position. It is not only out there, but it resists motion to put it back into its proper position. That must be due to injury to the motor nerves.''

When plaintiff left the hospital he was furnished by defendants' surgeon with a wide brace or belt which fitted around his body just above the pelvic regions; he was also given a pair of crutches. At the time of the trial he was still using both appliances; he could not walk without the crutches. He suffered pain almost constantly—in the small of the back, in the left hip and in the back of his head and neck. Any movement of his body caused pain; if he sat a long time, his left limb and back hurt; when he walked there was a sensation of his hips spreading apart and his spinal column pushing down between them, accompanied with pain; when he bent forward he experienced dizziness; frequently his left leg became cold and numb; he was nervous; and his sleep was often broken and fitful.

Examinations made by experts just before the trial disclosed that plaintiff's hearing and vision were defective, and that to some extent he lacked coordination. The vision of the right eye was only one-tenth normal; that of the left eye, one-fifth. Both optic nerves were partially atrophied. There was also a pterygium on the ball of the right eye—a fibrous growth which extended from the inner corner of the eye to the edge of the pupil. This growth had not yet affected the vision of that eye. There was also a degeneration of the auditory nerves. The hearing in the right ear was about one-fourth normal, and that in the left about one-fifth. The principal symptom of defective coordination was that of stammering. These conditions all developed after plaintiff's injury on October 19, 1922. The experts gave it as their opinion that all of them (except the pterygium) could have been caused by a severe blow on the back of the head. In this connection it is to be noted that plaintiff testified that he remembered nothing after he swung himself from the cab of his engine until four days later, when he found himself in the hospital at Mexico, and that his wife testified that while he was in that hospital ''he did not seem rational, he did not seem to know anything.''

146

According to the opinions of medical experts who testified for plaintiff his disabilities are permanent in character, will persist through life. Prior to the occurrence which he claims gave rise to them, plaintiff was an active, vigorous man, enjoying good health and in the normal possession of all of his faculties. He had been in the service of the railroad all of his adult life, an engineer for eighteen years. His earnings averaged $238 per month.

The foregoing, in so far as it relates to plaintiff's injuries, is a summary of the evidence on his behalf. The defendants' evidence tended to show that the alleged pathological conditions claimed to have resulted from the injuries plaintiff received at the time of the train collision either do not exist or else are greatly magnified, and that such of them as do obtain can be as readily attributable to other causes.

In addition to their contention that the damages are excessive, appellants assign as error: The refusal of the trial court to grant them a continuance; and its refusal of an instruction withdrawing from the consideration of the jury the evidence with reference to the pterygium on plaintiff's right eye.

I. When the case was called for trial in the circuit court the defendants presented an application for a continuance on the ground of absence of a medical witness. The absent witness was one Dr. Pearse, who, according to the application, was a leading physician and surgeon of Kansas City and who had suddenly and unexpectedly been compelled to go to a hospital for a surgical operation upon himself the day before the cause was set for trial. The application further set forth that the witness, on December 30, 1922, at the request of the defendants, had made a physical examination of plaintiff with the view of determining his alleged physical injuries and his then condition; that if present the witness would give valuable testimony for the defendants; that defendants were unable to set forth in detail what the testimony of the witness would be because of their lack of knowledge of medical terms and because of their inability to have a conference with him. With the exception of the omission of what the absent witness would testify to, if present, the application was in statutory form. In connection with the written application defendants' counsel stated orally that in the preparation of the defense he had been relying not only on the evidence Dr. Pearse would give, but upon his services as a consulting expert during the examinations of the medical witnesses. On the hearing it was made to appear that plaintiff had been under the exclusive professional care of defendants' physicians and surgeons, who were in attendance as witnesses, from the time he was hurt until sometime the first part of January, 1923. In that connection the court announced that defendants would be given permission to have another

physical examination made of plaintiff, if they so desired; and further, that they might read as his testimony a statement from Dr. Pearse, if they were able to obtain one before the conclusion of the trial.

The granting, or refusing, of a continuance, under the circumstances disclosed in this case, was a matter resting within the sound discretion of the trial court. We are unable to find that there was any abuse of that discretion.

II. The instruction, the refusal of which is complained of, would have told the jury not to consider the pterygium on plaintiff's right  eye in determining the amount of his damages. Appellants contend that there was no evidence tending to show that the pterygium was caused by defendants' negligence. We do not deem it necessary to discuss at length the evidence bearing on this feature of the case. Briefly, it tended to show that prior to the time plaintiff sustained injuries in jumping from the cab of his engine his eyes were in every respect normal, entirely free from defect or blemish; that one of the injuries he then sustained was a slight cut across the right eye, injuring somewhat the eye ball itself; that such an injury to the eye ball could have caused the pterygium; and that between the time of the injury to the eye ball and the date of the trial such growth had developed and become plainly observable. On these facts the jury would have been warranted in drawing the inference that the pterygium was caused by the cut across the eye received at the time plaintiff was compelled to jump from defendants' engine. And particularly in the absence of evidence of a specific character tending to otherwise account for the abnormal growth. The refusal of the instruction was not error.

III. It is quite apparent from the record that the evidence on the part of the plaintiff unduly magnified his injuries in many respects. That he is unable to walk without the aid of crutches, that practically all of his bodily movements cause him pain, that these conditions resulted from bruises and sprains of the muscles and ligaments in the pelvic regions of his body, and that they are of a more or less permanent character, was shown by fairly convincing evidence. On the other hand the evidence offered to show: that his coordination is defective and that that and his diminished hearing and vision were caused by the injuries he did receive at the time of the collision, leaves doubt and uncertainty in the mind of one who gathers it from the printed page. But the jury must have found that the plaintiff sustained, as a direct result of the defendants' negligence, all of the injuries which the evidence in the remotest way tended to show. From the amount of damages awarded no other conclusion can be

reached. And their finding as to the character and extent of plaintiff's injuries is conclusive upon us. We are not at liberty to review the evidence and make our own finding with respect thereto as though the case was one in equity. This seems obvious enough. But frequently defendants' counsel, in cases of the character of this, assume that they are entitled to a hearing *de novo* in the appellate court, in so far as the elements of the damages are concerned.

It was disclosed by the evidence that all of the expenses incurred by or on behalf of plaintiff for medical care, nursing and attention had been paid by defendants. The remaining elements of his damages consisted of the pain and suffering endured, and to be endured; the loss of a normal body and the enjoyment incident to the free and unrestricted exercise of all its faculties; and the loss of earning power, past and prospective. For all of these he was entitled to recover a fair and reasonable compensation. There is of course no fixed standard for measuring in dollars and cents the compensation which should be allowed for pain and suffering. With respect to the loss of earning power the situation is somewhat different. In considering that element for the purpose of determining whether the verdict is excessive, we must assume that the plaintiff's earning power was wholly destroyed, because the jury evidently so found. At the time of the trial, eighteen months after his injuries, he had lost in earnings $4,282. He was then forty-five years old and had an expectancy, according to the Carlisle tables of mortality, of 24.46 years. His annual earnings had been $2,856. The present value of such earnings for 24.46 years, interest at 6 per cent is $32,638.36. It cannot be said, however, that this sum represents with reasonable certainty, or even according to strong probabilities, plaintiff's loss in prospective earnings. He was apparently at the peak of his earning power and there was no showing that but for his injuries he would probably have continued to earn the same amount annually during the remainder of his life. There are intimations in the evidence to the contrary. It was said, by plaintiff himself, that during bad or stormy weather the older engineers did not go out on their runs. And again, it must be evident that a locomotive engineer, employed in an extra hazardous occupation, would not have an expectancy as great as the average life duration derived from the lives of a group of persons who had collectively engaged in all occupations. [Midway Bank & Trust Co. v. Davis, 288 Mo. 585, 233 S. W. 406.] In any event standard life and annuity tables are not the preclusive means of arriving at a fair and just estimate of the present value of anticipated earnings; they are mere aids. [Gill v. Railroad, 302 Mo. 317, 259 S. W. 93; Ches. & Ohio Ry. v. Kelly, 241 U. S. 492.] With respect to the question in hand, whether the verdict is excessive, our rulings in other cases with reference to the maximum amount of damages allowable for injuries and loss of earning power com-

parable with those in this case furnish a guide of more or less general application. Looking to these precedents, we are of the opinion that the verdict in the instant case is excessive to the extent of $20,000. The judgment will be affirmed, if respondent will within ten days enter here a *remittitur* of that amount as of the date of the original judgment; otherwise, the judgment will be reversed and the cause remanded for another trial. All concur.