Estell Roy Rucker, (Plaintiff) Respondent, v. Illinois Terminal Railroad Company, a Corporation, (Defendant) Appellant, No. 43598—268 S. W. (2d) 849.

Division Two, April 12, 1954.

Motion for Rehearing or to Transfer to Banc Overruled, June 14, 1954.

*Wayne Ely, Robert C. Ely* and *Joseph L. Badaracco* for appellant; *Ely & Ely* of counsel.

*Hullverson & Richardson* for respondent.

808

810

ELLISON, J.—The plaintiff-respondent Rucker, 36 years old at the time of the casualty on October 18, 1950, sustained injuries to his back in the sacral region [the lowest part of the spine joining the pelvis]. At the time he was working as a lineman with another employee Langendorf for the appellant Illinois Terminal Company at or near the McKinley Bridge in north St. Louis. They were attempting to place an 8 foot crossarm weighing 55 or 60 pounds in a position on a pole. He was on the pole helping to support the weight of the crossarm when his fellow employee Langendorf released his hold on it while it was hanging on a center bolt, and it dropped down onto respondent's safety belt and, as he stated, "that instant it snapped me." He did not bring this suit until two years later on October 26, 1952. The case was tried on an amended petition. The jury's verdict for plaintiff-respondent Rucker was for $75,000, the amount sued for. The court ordered a remittitur of $30,000, and judgment was entered for plaintiff for $45,000.

Defendant-appellant's first assignment under its points and authorities is that the jury verdict of $75,000 was so grossly excessive that it

indicates misconduct on their part; that the verdict was based on improper, incompetent and prejudicial testimony of plaintiff's actuarial witness and his medical witness; the admission of a self-serving letter written by plaintiff to appellant's supervisor complaining of his physical condition; and also on improper, unfair and prejudicial argument of plaintiff's counsel during the trial and throughout his final argument; and that the judgment of $45,000 entered by the trial court on remittitur was excessive, there being no evidence to show plaintiff suffered permanent injuries in view of the fact that he continued his employment in the same occupation, finally receiving a better paying job, until the trial of this suit.

With respect to his physical injuries, respondent testified that when the other lineman, Langendorf, dropped his end of the crossarm it fell across respondent's belt supporting his body near the top of the pole. He said that snapped his body like a whip and he immediately experienced "a sharp, knife-like, terrific pain in his back." After a few moments of rest he remonstrated with Langendorf but completed his work. At the noon hour he reported the matter to his foreman. He was unable to eat lunch, and that afternoon assisted the ground crew, going home at 3:30. Because of his pain he could not eat dinner that evening. A hot bath that night made him feel a little better the next morning.

He continued to work for about three weeks. During that period his back eased up considerably though the pain never completely disappeared. About then he began to experience pains in the buttocks and legs—worse on the right side. The pain increased until he could work no longer. In about six weeks on December 6, 1950, he consulted his foreman and on the latter's advice consulted Dr. Bower, the company doctor at Granite City, Illinois, who referred him to the Missouri Pacific Hospital in St. Louis, Missouri for X-ray and treatment. Dr. Lembeck, chief surgeon, and Dr. Hawkins a neuro-surgeon, took X-ray pictures of his back on December 27, 1950, after a radio opaque dye had been injected into the spinal canal, which would disclose space occupying lesions, such as tumors or ruptured intervertebral discs, and thereby establish their location. The hospital record showed anesthesia was administered for 2-½ hours on December 29 and that a herniated lumbar disc was removed, with portions of adjacent tissue or parts, including the lamina and sacrum. This was done by Dr. Hawkins, but neither he nor Dr. Lembeck testified at the trial.

The evidence shows that after his operation on December 29, 1950, respondent was discharged from the hospital late in January and returned to work on March 13, 1951. He was advised to refrain from climbing poles or doing heavy work. He so notified company officials on April 9, 1951, not for the purpose of making a claim but to put them on notice of his inability to do a lineman's work. The claim department answered advising him he had not made an accident report. He then

made out a report on May 15, 1951. Either in that report or the foregoing letter of April 9, 1951, respondent stated the railroad physician Dr. Bower had told him he could not do climbing work before July, 1951.

Respondent's total pay in 1950, the year he was injured, was $4,192.08, a monthly average of $369.20, exclusive of December, during which he spent some time in the hospital. In 1951 it was $3623.24, a monthly average of $377.60 for the nine full months he worked. For 1952 until his employment with the appellant ended his total earnings were $2476.99, an average of $321.49 per month excluding August, since he worked only until August 22. From August 29, 1952 until September 23, 1952, he worked for another company where he could sit down, and earned $411.80, but had to quit because "he couldn't go any longer." That was six days before his trial in this case began. Respondent's total earnings in 1950, including the time before his injury, were $4192.08. In 1951 his earnings were $3623.24. The evidence shows that from the time of his injury to the date of trial he was hospitalized a total of only 28 days. His most recent occupation, in which he was engaged at the time of the trial, paid him $411.80 for a period of five days less than a month.

Respondent testified as to previous injuries he had received while working for the defendant-appellant Terminal Railroad. He stated that some six years earlier in 1944 while pulling slack on a trolley wire the wire broke and he fractured his arm in four places, a double fracture at the elbow and also at the wrist. He was laid up for 6 or 7 months. A year later in 1945 after he had returned to work his arm "stuck" on him and wouldn't come back down. The Company sent him to Peoria where he was subjected to surgery and all the affected bones were scraped. He was off duty about 11 months altogether, but was paid for his time.

Referring to the instant injury respondent said his back pained him off and on for two or three weeks depending on what he was doing. If the work was heavy the pain increased: if it was light it wouldn't pain so much and after two weeks it disappeared. He went along and continued to work. He had a recurrence of the pain in his buttocks and right leg. It was dull and hard. He thought it might be rheumatism or arthritis. On that occasion he went to the Missouri Pacific Hospital for the first time. The doctor told him he had a complete ruptured disc in his back—a fresh break.

The appellant railroad asserts respondent's claim of total or permanent disability from the injuries in suit is not consonant with his work and earnings record as shown by the facts already stated, which show he lost only three months time, over 80% of which was associated with his recuperation from his operation, disproving his claim for total or permanent disability. The case was tried almost two years after the alleged injury caused by the negligence of his fellow employee Langen-

dorf in letting the crossarm with which they were working slip out of the former's grip.

The plaintiff-respondent Rucker's medical evidence consisted of the testimony of Doctors Woolsey, Ford and Scherman. Dr. Woolsey was a neuro-surgeon and graduate of Harvard Medical School in 1937, and had served in various hospitals including a general hospital for the Army. He found respondent complained of pain in the lower back and the back of both legs, especially the right. There was a limitation of about 45 degrees in bending forward on the right side and ten degrees on the left side, and some atrophy.

There was a ruptured disc in the interspace between the fourth and fifth lumbar vertebrae, and/or between the fifth lumbar and the first sacral vertebrae. The gelatinous material between them was or may have been extruded diminishing or affecting the functioning of the nerves. Respondent's expert witness Dr. Woolsey testified the pain of which respondent complained could be attributed to these conditions, as affecting his back and the back of both legs, more on the right than the left, and his limited ability to bend forward. The witness said respondent had a small amount of atrophy in the right leg and some enervation of the muscle there, indicating something causing diminished functioning of the fifth lumbar and first sacral and the fourth and fifth lumbar nerves. He thought two nerve roots were involved, and that the sudden dropping of the crossarm weighing 65 pounds by the fellow workman Langendorf jerking respondent forward and causing sudden pain may have been the cause of respondent's ruptured disc. He thought there should be another operation.

Respondent Rucker's second expert witness Dr. Lee T. Ford was an orthopedic surgeon practicing in St. Louis since 1941. He examined respondent's back on May 2, 1952, a few months before the trial, after ascertaining his complaints. He found he could stand and walk erectly. But he was unable to bend forward and touch his toes with his knees straight, and the same was true as to bending backward, though he could walk tiptoe without pain. He could do the same on his heels.

However, when his neck was squeezed and he took a deep breath it caused pain in his hips and buttocks, which is a recognized test, since it causes venous pressure inside the spinal canal and if pressure is already present on the nerves pain is produced. A test of his reflexes showed the right ankle jerk was diminished and the same was true of the right leg over an area served by the fifth lumbar nerve root along the front and side of the leg. But the circumference of that leg was an inch less than that of the other. Myelogram X-rays taken at a hospital in February, 1952, showed a disc defect between the fourth and fifth lumbar vertebrae. Dr. Ford expressed the opinion that respondent cannot do any type of manual labor involving use of his back, bending or stooping, without pain; that sedatives are habit forming; and that his back should be re-operated upon.

Dr. Victor E. Scherman, a general surgeon in St. Louis since 1928, had treated respondent Rucker in 1952, and had examined the records of the Missouri Pacific Hospital where respondent had been a patient. He complained of low back pains, pains down the back of both legs, particularly the right leg. The doctor tested respondent's ability to move his back forward, backwards, sidewards, and rotated his back. Cautioning the patient to relax completely he manipulated his leg, straight and flexed. This caused pain which was increased by these various movements stretching the sciatic nerve extending down the back of the leg. Constriction of the neck and jugular vein increasing the blood pressure therein and in the spinal column, caused pain down the back and right leg. Tapping with a rubber hammer on the heel of that leg caused no jerk, but did on the left.

The doctor concluded there was a definite lack of sensation in the right leg caused by some impingement on the nerves coming out from between lumbar vertebrae No's 4 and 5, and also from between the 5th lumbar and the 1st sacral vertebrae. He said the pain was so acute that on two occasions respondent broke down and cried. The treatment was sedatives which were or could be habit forming. He said the back condition was permanent, and that another operation would be needed to relieve the pressure on the nerves affected, and that even then it would not be a normal back.

The appellant railroad introduced the deposition of Donald Force, one of its linemen who was in the Armed Forces at the time of the trial. He was working with the crew some 600 to 800 feet away at the time respondent was injured on October 18, 1950, but didn't recall the injury as of that date. He thought two of the crossarms were about 6 feet long, weighing 40-45 pounds, and the other was about 10 feet long and weighed about 65 pounds. All are pulled to the top of the pole with a rope block and tackle by a ground man, in this instance Mayberry. Respondent Rucker had mounted the pole wearing a safety belt. He would pull up the crossarms with a rope until they could be bolted by the men above. In this process one of the men, Langendorf, let the crossarm slip and it dropped on respondent's safety belt, causing a violent jerk. However, the deposition of witness Force showed he was not at work on that pole and did not learn of the accident until later.

Langendorf testified he remembered working with respondent Rucker on some double crossarms in the fall of, or in October, 1950, when Mayberry was the ground man, but did not recall dropping any crossarms on Rucker's safety belt, though he may have dropped one. But he didn't think Rucker said anything to him about it.

Nine members of the jury signed a verdict in favor of the plaintiff-respondent Rucker, assessing his damages at $75,000 and judgment was entered accordingly. The defendant-appellant railroad filed a motion for a directed verdict in its favor, or in the alternative for a new trial.

There were 39 assignments in the latter motion. The trial court conditionally ordered a remittitur of $30,000, otherwise the motion for new trial to be sustained on the ground that the verdict was excessive. Plaintiff-respondent remitted the $30,000. The trial court then set aside its prior judgment, and entered a new judgment for $45,000 and costs against the defendant-appellant, and overruled its motion for new trial.

The defendant-appellant railroad's first point is that the trial court erred in admitting the testimony of an insurance actuary Reeder, who had been called as an expert witness by the plaintiff-respondent Rucker. The witness purported to state the money equivalent of Rucker's lost wage earning power of $300 per month due to his injuries, based on his age of 37 years at the time he received them. The witness said respondent's *life* expectancy at that time would be 33.44 years under the railroad retirement act, or slightly over 70 years, but that on a *temporary* annuity basis up to a *retirement* age of 65 and monthly wages of $300, the total sum of $70,290 would be required to pay him. In other words, when he reached age 65 no money would be left in the retirement fund to pay the $300 monthly wage thereafter.

The appellant railroad's brief answers that the admission of the testimony of the actuary relative to plaintiff's life expectancy was reversible error since there was no showing that he was permanently disabled and he had continued to work "until five or six weeks" before the trial. Where the future duration of the condition remains in the realm of conjecture it is not regarded as permanent. On this point appellant cites 25 C.J.S., p. 593-5, §81: Ocean Accident and Guarantee Corp. v. Moore, 85 Fed. (2d) 369, 374-5 (5, 6) ; Weiner v. St. L. Pub. Serv. Co. (Mo. banc) 87 S.W. (2d) 191, 192(1). As delineated elsewhere in this opinion, there was substantial evidence of permanency in plaintiff's injuries and disability. The present assignment being grounded wholly upon a supposed lack of such evidence,. it follows that the assignment should be, and it is, disallowed.

The defendant-appellant railroad's second briefed contention is that the jury's verdict of $75,000 damages for plaintiff-respondent's injuries was so grossly excessive as to indicate *misconduct on their part* and constituted reversible error. The motion for new trial does not contain that assignment. It says the excessiveness was due to the admission of improper testimony and remarks of counsel. As we have stated the trial court ordered a remittitur of $30,000 conditioned on plaintiff-respondent's acquiescence therein in ten days, in which event the defendant-appellant railroad's motion for new trial would be overruled, but otherwise would be sustained on the ground that the $75,000 verdict was excessive. In obedience to that order the plaintiff-respondent remitted $30,000 from the verdict and the trial court entered a new judgment in his favor for the reduced sum of $45,000.

Nevertheless the defendant-appellant railroad still contends the

jurors' verdict of $75,000 was so grossly excessive as to indicate misconduct on their part constituting reversible error.[1] It is true the decisions just cited below do hold an excessively large verdict may be so much against the weight of the evidence as to show bias and prejudice. But it is also stated in Cruce v. Gulf, Mobile & Ohio Rd.Co., 361 Mo. 1138, 1148(6), 238 SW. (2d) 674, 680: "the verdict of a jury which the trial court permits to stand, as corrected by remittitur, 'presupposes a verdict resultant of the jury's unbiased, dispassionate and impartial consideration of the evidence,' " citing Jones v. Penna. Rd. Co., 353 Mo. l.c. 171, 182 SW. (2d) l.c. 159.

However, the Cruce case then goes on to say "an excessive verdict does not in and of itself establish that the verdict was the result of passion and prejudice," citing O'Brien v. L.&N. Rd. Co., 360 Mo. 229, 236(6), 227 SW.(2d) 690, 693(6). And the latter decision quotes Kimberling v. Wabash Ry. Co., 337 Mo. 702, 717, 85 SW.(2d) 736, 737 (13) which says: "The mere size of a verdict for damages for personal injuries, although it be necessary to reduce it one-half or more, does not indicate passion or prejudice." Other decisions are then referred to where verdicts were reduced from $45,000 to $15,000; $40,000 to $18,000; and $85,000 to $35,000. We think there is no merit in the defendant-appellant's contention that the jury's verdict of $75,000 in this case invalidated the judgment for $45,000 as reduced and entered by the trial court.

 The defendant-appellant railroad's next assignment complains of the admission in evidence of a letter written by the plaintiff-respondent Rucker on November 16, 1951 to Mr. John Leisenring, appellant's electric supervisor at Springfield, Illinois, as follows: "Due to my physical condition which prevents me from climbing poles, I am requesting that I be transferred to ground work until such time as my condition may permit me to resume line work in the Granite City area." A copy of this letter was sent also to James McGowen, General Chairman of the railroad.

On November 23, 1951, Mr. Leisenring, the supervisor, acknowledged respondent's foregoing letter requesting a transfer to ground work, and in reply stated the request could not be granted because there was no groundman's job assigned to the Granite City territory, and that if respondent's condition was as he had stated it would be better for him to lay off completely until he was sufficiently recovered to resume his line work. Appellant's counsel moved to strike out the last clause of this Leisenring reply letter of November 23 on the ground that it was a mere conclusion of Leisenring who was not a doctor; that it was not for him to say what plaintiff-respondent Rucker should do in the cir-

[1]Parks v. Thompson, 363 Mo. 791, 798(2), 253 SW. (2d) 796, 798 (3); Bailey v. Interstate Airmotive, Inc., 358 Mo. 1121, 1135(7), 219 SW. (2d) 333, 340(12); Jones v. Penna. Rd. Co., 353 Mo. 163, 172(5), 182 SW. (2d) 157-8(6).

cumstances; and that the statements in plaintiff Rucker's letter of November 16 to him were self-serving.

We do not agree. Rucker's letter was not self-serving. It was a straight out request to his superior officer for a temporary transfer to ground work until his then condition improved sufficiently to permit him to resume climbing poles. It did not purport to state the cause of his disability, or to claim his injury was permanent, or to cast·blame on the appellant railroad. 31 C.J.S., p.954, §216(b); Jones v. Central States Oil Co. (Mo.App.) 170 SW. (2d) 153, 159(9). It appears that later Rucker wrote a letter to James McCowan, who had been line foreman for the appellant railroad three different times covering a period of 18 years. The record shows the letter was dated July 28, 1952, and on the same subject matter of climbing poles. The trial court excluded a carbon copy of that letter on the ground that it was too remote.

█ The appellant railroad's fourth point charged that the 4th, 5th and final paragraphs of instruction No. 10 were erroneous because they were not supported by the evidence; and permitted consideration of possible future loss of wages and earnings, permanent injuries, and the investment capabilities of plaintiff, none of which were supported by the record.

Those paragraphs of that instruction authorized the jury, if they found for plaintiff (Rucker), to assess his damages at: (4) "such loss of wages and earnings, if any, as you find from the evidence that plaintiff is reasonably certain to suffer in the future as a direct result of the occurrence mentioned in the evidence;" (5) "such distinct permanent injuries, if any, as you find from the evidence that Mr. Rucker has suffered as a direct result of the occurrence mentioned in evidence;" (6) "In assessing damages, if any, to plaintiff,· you may take into consideration his age, education, experience, training and earning power." Also they were authorized to take into consideration the earning power of money and such reasonable rates of interest as they found from the evidence that persons of plaintiff's age and experience might reasonably be expected to derive from the investment of the money awarded him in ·reasonably safe securities.

The appellant railroad contends these three paragraphs of this instruction No. 10 were erroneous because they were not supported by the evidence; and because they "permitted consideration of possible future loss of wages and earnings, permanent injuries, and the investment capabilities of the plaintiff, none of which were supported by the record." On this point appellant cites the following decisions: Stupp v. Swaine Mfg. Co. (Mo.) 229 SW.(2d) 681, 685(5); Spears v. St. L. Pub. Serv. Co. (Mo.App.) 202 SW.(2d) 578, 579; Dehn v. Thompson (Mo. App.) 181 SW. (2d) 171, 175 (12); State ex rel. K.C. Pub. Serv. Co. v. Shain, 350 Mo. 316, 165 SW.(2d) 428, 430(3-5); Colby v. Thompson (Mo. App.) 207 SW. 73, 74(3).

In the Stupp case, just cited, all the plaintiff's fingers on his right hand were mashed and lost by the unexpected action of a stamping machine in "repeating", that is, starting without operation of the automatic starting device. He was unable to work for four months. Included in his petition and an instruction 12 as a part of his damages were $200 per month for four months lost wages, and such past and future physical and mental pain and suffering as the jury might find from the evidence he had and would endure. He entered a new employment at increased pay. But the record failed to show he would suffer any loss of future earnings at his former pay rate of $200 per month. This court in that case held the giving of the foregoing instruction No. 12 was erroneous.

The Spears case, supra, merely held that where a general charge of negligence is followed by a specification of particular acts of negligence the plaintiff is confined to the latter in making his proof under the petition. The Dehn case, supra, held a plaintiff automobile guest could not recover from a railroad for injuries sustained in a railway crossing collision unless the collision resulted solely from the negligence of the automobile driver; and that an instruction submitting the question of impairment of the plaintiff guest's earning capacity was erroneous unless there was substantial evidence showing such impairment.

The Public Service-Shain case, supra, held that to recover damages for permanent injuries, permanency of the injuries must be shown with reasonable certainty, and while absolute certainty is not required mere conjecture, likelihood or even probability will not sustain the allowance of damages on that basis.

The Colby-Thompson case, supra, was a suit for an assault. The petition alleged facts from which it might be implied that the plaintiff would suffer in the future but did not say the injuries were permanent. Nevertheless a plaintiff's instruction submitted that question to the jury. The Court of Appeals held this was error. Whether that ruling was correct or not is immaterial here, because the petition in this case alleged the plaintiff-respondent's injuries were serious, impairing and *permanent*. There was also some expert testimony to that effect.

Dr. Woolsey testified he thought the plaintiff Rucker's back injury would be permanent unless he had another operation. That would determine whether it was going to continue to be permanent. Dr. Ford testified he thought the plaintiff should be re-operated upon and that the ruptured disc at the 4th vertebra should be removed. He said in about 50% of the cases there was no difficulty after surgery, 35% were greatly improved, 10% still had a good deal of difficulty with the back and possibly the leg, and that 5% were no better or were no worse than before the operation. He said he thought there would be some permanent damage to the nerves in plaintiff's case. He called it a "sizeable portion of it." Dr. Scherman who had examined plaintiff six times but had not operated, said plaintiff's back "is no longer a nor-

mal back," and that there would be an impairment of function even if a second operation "were successful."

The defendant-appellant railroad's counsel, Mr. Ely, contends under his fifth point that plaintiff-respondent Rucker's counsel committed reversible error in his closing argument to the jury by persistently maintaining that the defendant railroad had not produced as witnesses three doctors who had examined and treated plaintiff Rucker when he first entered the hospital before his operation in December, 1950. These doctors were Dr. Bowers, the railroad physician at Granite City, and Doctors Lembeck and Hawkins, surgeons. The railroad's counsel, Mr. Ely, in his opening statement to the jury stated he believed Dr. Lembeck and Dr. Hawkins would testify and that Dr. Bowers "would be here" at the trial. And he further asserts authorities are abundant holding that argument of the foregoing character to the effect that a defendant had failed to bring in particular doctors who were equally available to the plaintiff was reversible error. Atkinson v. United Rys. Co., 286 Mo. 634, 641(3), 228 SW. 482, 485(4); State ex rel. Pub. Serv. Co. v. Bland, 325 Mo. 505, 508(1), 30 SW. (2d) 445, 446; Arnold v. Met. Life Ins. Co., 89 SW.(2d) 81, 83(1); Glossip v. Kelly, 228 Mo. App. 392, 399(13), 67 SW.(2d) 513, 517(13).

Respondent concedes such to be the law, but insists that the rule is without application here, and to this we agree, because the record does not sustain appellant's charge. On the contrary, the court sustained appellant-defendant's objection to the offending statement, and this alone settles the matter. In the first place, respondent's counsel did not draw an unfavorable inference or make an unfavorable comment upon the failure of the defendant to call certain physicians. Defendant's counsel, in his opening statement, had stated that certain doctors "will be here and testify to what they found * *. They will all tell us that this slipped disc which was removed by operation * * * had caused him no further trouble and is not causing any trouble now." The offending statement in the closing argument of plaintiff's counsel [which forms the basis of the present assignment] is as follows:

"Mr. Hullverson: Now, what have we here? I told you what I would show you in this case. Mr. Ely also had an opportunity to tell you what he would show you. And what did he say? He said he would show you that there wasn't any accident and he would show you that he certainly didn't get any injury on that pole, that he wasn't hurt on the pole, and, he said, there were four doctors that treated him and he would bring the four in to show you that there wasn't a single thing wrong with him."

Mr. Ely objected "to any argument directed against me for not bringing in any of the three plaintiff's doctors [Bowers, Hawkins and Lembeck] * * * if the plaintiff wanted them in here, it was up to plaintiff to bring them, not us, but up to the plaintiff. I didn't say we would bring them in. I said they would be here. I assumed they

would.'' This objection was sustained and the jury instructed to disregard the argument.

It strikes us that defendant's counsel, by forecasting and in effect promising that certain doctors would be present and testify as to their findings, may not complain if opposing counsel makes reference thereto. Finding no violation of the rule invoked by defendant, the point is disallowed.

■ The final contention in the defendant-appellant's brief complains that the ■ judgment for respondent Rucker for $45,000 is still grossly excessive. As will be remembered the jury's original verdict was for $75,000. The plaintiff was 36 years old at the time. He was a railroad electric lineman and pole climber, a hazardous business. He suffered a painful fracture of one and probably two intervertebral lumbar.discs. The first surgical operation did not cure or correct the condition. Several of the surgeons said another operation probably would be necessary. The jury's verdict of $75,000 was reduced $30,000 to $45,000. Respondent has been in litigation over the case 3-½ years. In the meantime the purchasing power of money has declined. In our opinion the reduced judgment should stand, and it is accordingly affirmed. All concur.