Bernice **BRELAND** (Plaintiff), Respondent,

v.

**GULF, MOBILE AND OHIO RAILROAD COMPANY, a Corporation (Defendant), Appellant.**

No. 46978.

Supreme Court of Missouri,
Division No. 1.

June 8, 1959.

pany's motion for a new trial, in which the question of excessiveness was raised. The railroad company perfected this appeal.

The sole question on this review is whether the $75,000 verdict is excessive. The railroad company contends that plaintiff's evidence as to injuries, permanence of injuries, and the connection between the accident and plaintiff's condition is vague, speculative, confusing and inadequate to show inability to work in the future. The railroad company asserted in argument that the maximum damages to which plaintiff is entitled is $20,000 to $25,000 and calls for a remittitur of $50,000 to $55,000. Plaintiff, claiming the benefit of the rule that the evidence must be viewed in the light most favorable to him, Williamson v. Wabash R. Co., 355 Mo. 248, 196 S.W.2d 129; Meade v. Kansas City Public Service Co., Mo.Sup., 250 S.W.2d 513, contends that plaintiff sustained permanent disability, great pain and suffering, considerable loss of past and future earnings, and maintains that the verdict is not excessive but is low, considering the deflated purchasing power of the dollar, other approved verdicts and the rule of reasonable uniformity, the superior position of the trial judge and jury in estimating damages, and the fact that the trial judge approved the verdict of the jury without requiring a remittitur.

Plaintiff's evidence as to his injuries was given by himself, his wife, and four doctors, one of whom testified in person and three of whom gave their testimony by way of deposition. The railroad company's medical evidence consisted of the testimony of three doctors.

A compendium of the pertinent evidence follows. Plaintiff, who had a 9th grade education, commenced his employment with appellant as a section laborer in 1927. He was promoted to section foreman, and went in the engine service in 1943 as a locomotive fireman in which classification he was steadily employed until the date of his injuries on April 13, 1955. At the time he was 48 years old, weighed 227 pounds and was in good health. He had no previous back in-

Ely & Voorhees, Alphonso H. Voorhees, St. Louis, for appellant. J. N. Ogden, Mobile, Ala., of counsel.

Claude W. McElwee, St. Louis, Michael H. Lyons, Alphonsus A. Seibutis, Chicago, Ill., for respondent.

HOUSER, Commissioner.

This is an action for damages for personal injuries, brought by Bernice Breland, a railroad fireman, against Gulf, Mobile and Ohio Railroad Company, under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. A jury trial in the Circuit Court of the City of St. Louis resulted in a verdict and judgment for plaintiff for $75,000. The trial judge overruled the railroad com-

juries and no illness for any length of time, other than influenza. His sleeping habits were normal, his posture was straight and he did not stoop, stand with a list or walk with a limp. He had not been troubled to any degree with backaches or leg aches and while he had headaches, they did not "amount to anything." At the time of trial in January, 1958, plaintiff weighed 150 to 154 pounds. Since the accident he sleeps no longer than two hours at a time. He wears a back brace and although he can walk without a cane he uses one to take the strain and pain off his left leg and back. He stands with a list or tilt with his left knee bent, walks with a limp of his left leg. He is of the opinion that his walking difficulty is getting worse. He has difficulty climbing steps and after walking the distance of a block he gets severe pain in the leg and lower back. The pain will subside and he will get some relief if he lies down, but in two or three hours the pain starts again. Headaches are frequent and severe. He has terrific pain through his legs during normal bathroom movements. On doctor's advice he went hunting three or four times and fishing five or six times after the accident but had to give it up because walking hurts so badly. He cannot sit in a boat. He cannot drive his automobile because it hurts his left leg and back. He has given up the sport of pitching and throwing the baseball with the children in the back yard.

Plaintiff's injuries were sustained when the lead Diesel engine on which he was the fireman was derailed, causing him to be thrown from his seat up into the air. He struck his head on the steel wall and his back on a generator fastened to the floor of the engine. He was rendered unconscious. After regaining consciousness he experienced terrific pain in his lower spine and both legs for the next three or four hours during which time he was unable to walk. He had an "awful" headache. A large knot developed on his head. Hours later, with the assistance of several men, he was brought to a doctor. The next day he was taken to Rush Memorial Hospital, where he was confined for twenty-one days. The lower part of his back and spine were X-rayed. He was given morphine, sometimes three or four shots a day, for pain. He had pain nearly all of the time in the lower part of his back and legs. It would fluctuate in intensity. A large hematoma or blood clot which formed under the soft tissue of plaintiff's lower back was opened and drained. The operation, a one-inch incision, was over in five minutes but it took probably three weeks for the wound to heal. On returning to his home plaintiff would get up with the help of his wife and try to stand and walk, but the pain would become so severe that he would have to lie down. He felt uneasy and unsteady, like he was "walking on the side of a hill." After four or five days at home the pain became so severe that he could not stand it and he returned to the hospital. The second hospital stay lasted twelve days. His left leg was put in traction. This gave him no relief. He was fitted with a Taylor brace for his back, which plaintiff wore constantly from that time until the time of trial. In order to walk or "do any stirring around" the use of the brace is almost a necessity. He "can't stand it" if he does not wear the brace, a steel contraption that goes around the buttocks, comes up behind the neck, and has two straps through which the arms go. Released by Dr. Rush in September, 1955, plaintiff was advised to go to Missouri Pacific Hospital in St. Louis. Confined there twelve days, plaintiff was attended by Dr. Lembeck. He was X-rayed and given whirlpool baths twice. Plaintiff went back to Dr. Rush. Between June 1955 and July 1956 Dr. Rush saw plaintiff twelve times. In 1955 plaintiff was examined by a Dr. Imrie. In 1956 he was examined by five doctors, three in Birmingham and two in Chicago. In 1957 plaintiff spent three days in another hospital where he was examined by Drs. Shannon and Haynes. The railroad company sent plaintiff to St. Louis where he was examined by company doctors Moore and McCarroll in St. Louis in August, 1957. Two more St. Louis doctors examined plaintiff in 1958.

During the 33 months from date of injury to trial time plaintiff was unable to work and earned no money. Prior to his injury plaintiff, on an average run, made $30 a day going and $30 a day coming back. In performance of duties around the railroad yard he would get approximately $15 for an 8-hour day. The latter work now pays approximately $20, there having been two increases since the date of injury. Plaintiff's gross income in even dollars was as follows: 1952, $4,961; 1953, $4,797; 1954, $4,720; from January 1, 1955 to April 13, 1955, $1,519.

All of the medical experts agreed that plaintiff has a considerable amount of arthritis of the spine of long standing, variously referred to as spurring, lipping, hypertrophic lipping, arthritic lipping, hypertrophic arthrosis, degenerative arthrosis, bony projections, degenerative process of the spine, spondylitis and osteoarthritis. There is a pelvic tilt downward to the left. The opinions of the seven doctors with reference to back motions varied from "moderately limited" to "limited in all directions." One found back motions of only 35% of normal, another 60% of normal. There was a general agreement that in so far as posture is concerned plaintiff bends slightly forward and to the left with a tilt or list. Two of the seven doctors found that his knee jerks were diminished on the left side. The others found the knee jerks normal. Only one doctor found any abnormality in ankle jerk. He said the left ankle jerk was perceptibly less than the right. Three doctors found no sensory changes; four doctors found a hyperesthesia or loss of sensation to pinprick in the lower left extremity. Three doctors found a marked degree of muscle spasm in the lower back and one found "some" muscle spasm. On straight leg raising the doctors varied in their estimates from 60 to 90 degrees, right leg, and from 30 to 80 degrees, left leg. (80°–90° is normal.) One doctor said that his right leg was 50% normal, his left leg 15% normal, on straight leg raising. There was some atrophy in the left thigh and calf; the muscles of the left leg calf seemed flabbier and the left leg was larger than the right by ¼ to ½ inch. There was some atrophy of the left buttock.

Other findings reported by the various doctors included a definite and severe contusion of the lower back and injury into the muscles of his lumbar spine; a breaking of the transverse process of the fifth lumbar vertebra by direct violence; extreme tenderness to palpation in the left lumbo-sacral area; tenderness of the sciatic nerve in the left thigh; muscle spasm in the back; indications of sciatica; scoliosis (crookedness) of the spine, with a wedging of the vertebrae on the right side; obliteration of the usual lumbar curve; narrowing of the intervertebral spaces in the lower lumbar region; narrowing of the bodies of the third and fourth lumbar vertebrae on the right side; lack of motion in the lower half of the spine; flattening of normal lumbar lordosis and some wedging of the vertebral bodies in the upper lumbar area; a pelvic tilt downward on the left side with a left convex curve and shift of the dorsal spine slightly to the right; some degeneration of the discs on the right; clinical evidence of the possibility of ruptured discs (although no doctor testified that there was a disc injury, and a myelogram test was negative for ruptured discs).

No evidence of any bone fracture was noted by any doctor except Dr. Rush, the local railroad company doctor, and Dr. Leydig, who found a line on the X-ray plates leading him to be "suspicious" of a fracture. According to Dr. Rush a linear fracture of the transverse process of the fifth lumbar vertebra without separation or displacement is revealed by X-rays taken two days after the injury. X-rays taken later show no fracture line, indicating that any fracture that existed has healed. Dr. Rush testified that there would be pain from this fracture for a couple of months and then that pain would subside. Dr. Rush testified that plaintiff received a very definite and severe injury into the muscles of his lumbar spine; that the fracture line he observed estab-

lished the fact that plaintiff had a "hard lick"; that he had a previously existing degeneration of some of the lumbar discs; sciatic neuritis of the left low extremities, severe, coming from irritation of the nerve root.

The *diagnoses* of the doctors were as follows:

Dr. Stanley Leydig, an orthopedic surgeon, testified that plaintiff had an injury that aggravated pre-existing hypertrophic changes in his spine, "a chronic low back sprain which has been superimposed on the degenerative process in the spine"; injury to and irritation of the nerve roots that go to make the sciatic nerve; "traumatic radiculitis or associated traumatic neuritis," due to injury. He found no evidence of fracture; a soft tissue injury. He did not think plaintiff had a ruptured disc. Dr. H. R. McCarroll, an orthopedic surgeon, testified that plaintiff may have sustained some superimposed soft tissue injury. There is no evidence of fracture. It is impossible to state that there is a ruptured disc. Dr. Walter L. Moore, a diagnostic neurologist, found no organic condition in his examination of the nervous system to account for his complaints of pain in the back and leg; no injury to the brain or spinal cord or nerve roots which would cause loss of sensation in the left lower extremities; no acute radiculitis; some joint, bone or muscle disfunction causing a flattening of the lumbar spine and a listing of the trunk to the left, but no evidence of active pressure on the nerve or a nerve root to explain the symptoms found. The results of his neurological examination of plaintiff were normal. Dr. Walter G. Haynes, a neurosurgeon, found radiculitis, or irritation of the nerve root, involving the first sacral nerve root and possibly the fifth lumbar nerve root (although debatable) and although there was no evidence of a disc injury, that was a possibility. Dr. Leslie V. Rush, a general surgeon, found a fractured transverse process of fifth lumbar vertebra, healed; extensive pre-existing arthritis and some degeneration of a disc;

segmental nerve pain either from arthritic projections or possible disc protrusion. Dr. Rush testified that during the period of his observation plaintiff continued to lose weight and "he kept getting worse," without any objective finding to account for that fact. Dr. Paul W. Shannon, an orthopedic specialist, found disability of a considerable nature; sciatica and possibility of ruptured disc, but no medical certainty of a ruptured disc, and no fractured vertebrae. Dr. Donald T. Imrie, an orthopedic surgeon who examined plaintiff 48 days after the injury, found hypertrophic degenerative arthrosis of long standing with no definite evidence of fractures or dislocations of any of the lumbar vertebrae.

On the question of *causation* the doctors testified as follows:

Dr. Leydig: Plaintiff's condition is due to his injury. The injury did not cause but activated the changes in his back. Flabbiness, loss of muscle and weakness of left leg were caused by the injuries received in the accident. The accident caused the disability. Plaintiff's back is more vulnerable to injury than a normal back. Dr. Imrie: Degenerative arthrosis of the spine could be aggravated by a hard, sharp blow to the back, but plaintiff's condition could not have resulted from the injury. Arthritis of the spine of long standing was one contributing cause for distortion of his back and would normally cause certain pain and discomfort in the back aside from injury or trauma to the back. Dr. Haynes: Plaintiff's condition could be caused by trauma or injury. Trauma could aggravate arthritic spurring and scoliosis of long standing. Plaintiff's condition is compatible with the history of injury. There is a causal connection between the accident and the condition found in plaintiff. Dr. Shannon: The condition of plaintiff's back (spur formation and wedging, pain, sciatica) could be due to and is compatible with an old injury occurring 18 months previous to the date of examination and a history of trauma, but is also compatible with a history of developmental or congenital defects. The

pain running down plaintiff's leg can be caused by arthritis or by a ruptured disc. Trauma or injury could aggravate arthritic spurring and scoliosis of long standing. There is a possibility of ruptured disc. The sciatic nerve is irritated. Hyperesthesia of the left lateral calf indicates there is pressure on the lower lumbar nerves. Dr. Shannon finally gave his opinion that "there is a causal connection" between the accident and the plaintiff's physical condition as found by the doctor when he examined plaintiff on September 18, 1956; that plaintiff's list, resulting in scoliosis, is compatible with the injury; that the arthritis of the dorsal spine "could feasibly be compatible with trauma." Dr. McCarroll: The conditions of plaintiff's spine resulted from a developmental abnormality. He was sure that plaintiff's scoliosis did not result from the accident. Certain symptoms are compatible with a disc problem but with the amount of degenerative changes in the spine it is impossible to state that there is a ruptured disc. A nerve root irritation could be caused by scar tissue. Dr. Rush: The condition of plaintiff's spine, the pain and muscle spasm, although not the result of injury, could have been aggravated by injury or could have come on spontaneously. It could not be said with any degree of medical certainty that any of plaintiff's complaints of lasting pain, etc. resulted from injury but a blow such as plaintiff received could cause injury and irritation to the various nerve roots and could aggravate the pre-existing back condition; it is certainly possible. Dr. Moore: A nerve could be injured by trauma or injury and that would be a competent cause of pain. Plaintiff has no acute radiculitis. There is no neurological reason for plaintiff's list or limp.

With reference to the question of *permanence* the doctors testified as follows:

Dr. Leydig: "The findings and medical conclusions" he arrived at are permanent in nature. Dr. McCarroll: Plaintiff's symptoms, in the presence of the pre-existing bony abnormalities revealed by the X-rays, might be expected to persist over an indefinite period of time. Dr. Imrie: After the examination of May 31, 1955, plaintiff would show further improvement with time, rest, use of heat and avoidance of straining activities, and within four months should be nearly as well as before the injury. Dr. Haynes: It is impossible to express an opinion as to the permanency of plaintiff's condition with any degree of medical certainty. If the radiculitis was caused by a disc injury it could be relieved by removal of the disc; if caused by arthritis it would probably persist for the remainder of his life. A disc operation is a possibility but he advised that an operation be deferred because of the risk of a poor result. On September 14, 1955, it was Dr. Rush's opinion that plaintiff's "improvement had become stationary."

With reference to *ability to work* Dr. Leydig did not believe that plaintiff would be able to return to his occupation as a fireman for the railroad company. Dr. Imrie, basing his opinion upon the changes of the spine and the degree of arthritis he saw, did not think plaintiff was a "suitable candidate for the type of work he had been doing," and that he should not return to work as a locomotive fireman; that a person with that type of back is vulnerable to back strains and should not do strenuous work requiring awkward positions or quick movements, and that he "in all probability was not in proper physical condition to return to his employment * * *." Dr. Rush on February 3, 1956, gave plaintiff permission to work if he thought he could successfully carry out the duties of his occupation and did not believe that riding in a locomotive would do him physical harm. He left it to plaintiff's discretion. Dr. Shannon: Plaintiff could not do anything at the time of his examination that would entail labor or climbing or activity. He advised against surgical procedures at this time.

■ The railroad company's contention that the evidence as to injury, causal connection between accident and injury, and

permanence of injury is vague, speculative and confusing stands for disapproval. The railroad company has carefully pointed out the weaknesses, inconsistencies and incongruities in plaintiff's medical evidence and has emphasized the portions of medical evidence favorable to the railroad company. These considerations, however, were for the jury and are not for this court to weigh, balance and harmonize. Our function is to determine whether there is substantial evidence to support a verdict of the size of $75,000. Considering the evidence in the light most favorable to plaintiff there is substantial evidence from which the jury could find that plaintiff, a 227-pound, 48-year-old, hard-working man, with a gross earnings average of $404 per month during the 39½ months prior to injury, in previous good health, was subjected to a violent trauma which converted him into a 154-pound, incapacitated, pain-ridden, semi-invalid whose disability is considerable and permanent, who for 33 months had been unable to work and earn money and who is incapacitated from performing any labor or engaging in any work requiring physical activity. He lost $13,335.50 in wages. He was in hospitals a total of 48 days. A vertebra in his back was fractured. He sustained a very severe hematoma. His earning power was seriously affected if not entirely cut off. He lost 73 pounds in weight. He suffered and still suffers great pain. He is unable to stand or walk erectly or normally. He cannot perform the duties of his employment. Having only a limited education, he is not equipped to earn a livelihood in other fields of endeavor. He cannot engage in normal activity and his condition is permanent. He was only 48 years of age at the time of his injury. This is substantial evidence entitling plaintiff to an award of substantial damages.

Plaintiff's position, however, that we should affirm the $75,000 judgment must be disapproved, under all of the standard tests. Plaintiff seeks to sustain this judgment by adding the sum of three numbers for a total of $75,000. To the wages actually lost for 33 months of inactivity from injury-time to trial time ($13,335.50) plaintiff would have us add the present worth of plaintiff's future wages based on the mortality tables, and the annuity or present value tables, sections 442.530 and 442.540 RSMo 1949, V.A.M.S. ($57,613.73), plus the value of pain and suffering, past and future, in the sum of $4,050.97. It is not that simple. Neither the jury nor this court should arrive at the figure representing loss of future wages or earning power, as one element of the fair and reasonable compensation to which plaintiff is entitled, by mathematical calculation from mortality and annuity tables, without considering other circumstances in the case. 25 C.J.S. Damages § 87, pp. 619, 626. Even if we assume that plaintiff's earning power has been totally destroyed it cannot be said with reasonable certainty that $57,613.73 represents the loss of future wages plaintiff has sustained. Plaintiff, a railroad fireman, was engaged in an extrahazardous occupation. It is evident that such a person would not have as great an expectancy of life as that of persons in a group collectively engaged in all occupations. Pulliam v. Wheelock, 319 Mo. 139, 3 S.W.2d 374 [3, 4]; Midway Nat. Bank & Trust Co. v. Davis, 288 Mo. 563, 233 S.W. 406. Furthermore, the $57,613.73 is based upon gross, not net, earnings, and no allowance has been made for the reduction of gross annual earnings by taxes, Gill v. Baltimore & O. R. Co., 302 Mo. 317, 259 S.W. 93, loc. cit. 98, possible diminution of plaintiff's earnings with advancing years, etc. As stated in Pulliam v. Wheelock, supra, 3 S.W.2d loc. cit. 378, and reiterated in Prince v. Kansas City Southern R. Co., 360 Mo. 580, 229 S.W.2d 568, annuity tables "are not the preclusive means of arriving at a fair and just estimate of the present value of anticipated earnings; they are mere aids."

The assessment of damages is peculiarly and primarily the function of the jury. The duty of the jury is to award such a sum as will reasonably compensate the plaintiff for the injuries sustained. The

jury's discretion is conclusive unless the amount of the award is excessive. An appellate court should not interfere with the action of a jury in this respect unless the injustice of the size of the verdict is manifest. In this inquiry we must take the view of the evidence which tends most strongly to sustain the award. Consideration must be given to the purchasing power of money, and we must bear in mind the inroads inflation had made on the bargaining power of the dollar at the time of the rendition of this verdict (January, 1958). The failure of the trial judge to set aside the verdict as excessive is significant. While each case must stand upon its own facts a reasonable uniformity of amounts of verdicts and judgments must be maintained. In determining the maximum amount for which a judgment in this case may be permitted to stand under the rule of uniformity we have read the cases cited by appellant, Osburn v. Kansas City Southern Ry. Co., 360 Mo. 813, 230 S.W.2d 856; Weisman v. Arrow Trucking Co., Mo.App., 176 S.W.2d 37; Brandock v. Atchison, T. & S. F. R. Co., Mo.Sup., 269 S.W.2d 93; Kiger v Terminal R. Ass'n of St. Louis, Mo.Sup., 311 S.W.2d 5; Gurley v. St. Louis Public Service Co., Mo.Sup., 256 S.W.2d 755; Lesch v. Terminal R. R. Ass'n of St. Louis, Mo.Sup., 258 S.W.2d 686; Snyder v. Jensen, Mo.Sup., 281 S.W. 2d 802; Amos v. Southern Ry. Co., Mo. Sup., 273 S.W.2d 155, and by respondent, Myers v. Karchmer Co., Mo.Sup., 313 S.W. 2d 697; Douglas v. Twenter, 364 Mo. 71, 259 S.W.2d 353; West v. Kurn, Mo.Sup., 148 S.W.2d 752, and many others, including Warning v. Thompson, Mo.Sup., 249 S.W.2d 335, 30 A.L.R.2d 1176; Cruce v. Gulf, Mobile & O. R. Co., 361 Mo. 1138, 238 S.W.2d 674; Dempsey v. Thompson, 363 Mo. 339, 251 S.W.2d 42; Hayes v. Wabash R. Co., 360 Mo. 1223, 233 S.W.2d 12; Sanders v. Illinois Cent. R. Co., 364 Mo. 1010, 270 S.W.2d 731; Blew v. Atchison, T. & S. F. Ry. Co., Mo.Sup., 245 S.W.2d 31; Rucker v. Illinois Terminal R. Co., 364 Mo. 804, 268 S.W.2d 849; and Lange v. Kansas City Southern Ry. Co., Mo.Sup., 290 S.W. 2d 71.

After careful comparison of these and other adjudicated cases, in the light of plaintiff's previous condition of health, his previously demonstrated earning capacity, the nature and extent of his injuries, the extent and permanence of his disability, the considerable loss of past wages he sustained, his age, life expectancy and loss of wages reasonably to be anticipated in the future, as well as all other factors to which reference has been made, we have concluded that a judgment over $50,000 would be excessive. Accordingly, if within 15 days plaintiff will enter a remittitur of $25,000, the judgment will be affirmed for $50,000 as of the date of judgment; otherwise, it will be reversed and the cause remanded.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur except DALTON, J., who dissents on ground that remittitur should be only $15,000.